The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning, everybody. Please be seated. Welcome to the United States Court of Appeals for the Fourth Circuit. We have one case on for en banc hearing. It's 22-4489. United States versus, and I hope I'm pronouncing it right, Chatrie, but if not, you can correct me. Mr. Price. Good morning, Your Honors. May it please the Court. The police had no reason to suspect Mr. Chatrie of the crime, but they got a warrant to search his location history data, along with the location data of millions of other Google users. All without probable cause, not for Mr. Chatrie, not for anyone. The warrant relied on generalizations and statistics about cell phone use that could apply in any case. It cast a digital dragnet that gave police discretion over what to search and seize. It was so overbroad and unparticularized that it was a modern-day general warrant. No reasonable officer could have believed it was constitutional. It was like making a landlord search every unit of a million-story apartment building, or making a bank search every safe deposit box for stolen jewels. Or making Microsoft scan every email for an incriminating phrase. Valid warrants don't work that way. So was there a geographical space limit on what was searched? There was a geographic limit on what was seized. In order to obtain the information about the devices near the bank, the government required Google to conduct a search of every Google user with location history enabled. The government, Google in this case, said that was at least numerous tens of millions of Google users. Isn't that any time you subpoena the records of a credit card company or a bank or something, they have to go through their files to find what's being asked for? In this case, they were asking for data about accounts within a limited geographical area and a limited time. One hour and a geographical area of what, 150 meters? And conducting an investigation to see what kind of markers the criminal may have left behind, and those spaces and time are related to where the bank robbery occurred. I mean, isn't that like going to a scene and picking up casings and fingerprints and blueprints and credit card things in the area to investigate a crime? It seems to me the search, if the search was very broad, electronics affords that, but the geofence can restrict the search to a context that is traditional in any crime investigation, which is to find the markers left behind by the criminal near the scene of the crime. I think in response to the question just posed to you, you have to recognize that the search was not of all of Google's files. They had to go through the files to select the data to fit the response, but the search request was for information of markers left behind within 150 meters of the bank and 30 minutes before and after the bank was robbed. So I think it's important to point out two critical issues here. First, this was not Google's data. This was personal data that belonged to each Google user who had location history. It was Google's records. It was Google's records. He consented to give it to Google. They are not Google's records, Your Honor. Even Google says they're not Google's records. Google says they are not business records, that they are akin to a personal journal. They are treated as user-generated content. They are kept in a user's account alongside their email and documents and photographs and other digital papers and effects that they have. It's like saying my bank records are not the bank's. It's wrong to me. Bank records are business records, Your Honor. Those records are created by the bank in the course of their daily business. They are their records, and so there's a difference between sending a subpoena… So these aren't Google's business? I mean, Google is in that business, aren't they? These are not Google's business records. Google is very clear. It's in giant… Well, they sold him on the phone to turn the records over, to get the records. He voluntarily gave the records to Google, and they use them for other purposes, for marketing and things like that. Google goes to great lengths to say that they protect user's data and do not give personally identifiable information to anybody. That's the best way to do business is go to a lot of… be cautious about maintaining people's privacy. But here you've got what they're looking for. They know a crime occurred, a bank robbery, a gunpoint, $195,000, folks on the floor, a teller scared to death, a bank officer scared to death, civilians or customers of the bank scared to death. And the robber had a phone. So there's certainly not just probable cause, there's absolute evidence of a terrible crime. The only question is who did it? Your Honor, in this digital age when people have cell phones attached to their hands like an appendage… To add to what Judge King said, the detectives here were completely out of leads. If they hadn't had this geofence warrant, this individual would never have been apprehended. As Judge King points out, he went into the bank vault and took $195,000. And if we invalidate all these geofence warrants, next time it's not going to be just a bank robbery. It could be a murder. It could be a terrorism attack. It could be something very terrible. And in many, many cases, the geofence warrant is required because the traditional leads of forensic evidence and witness testimony, they don't have it to wrap up the case. And what you're asking us to do is to essentially let this individual go free by the exclusion of relevant evidence. And how many crimes are going to follow and be unsolved? Because this tool of last resort, when other investigative tools fail, this tool of last resort has been sweepingly, is what you're asking us, not only as applied matter, you're asking us as a sweeping declaration to say that in all circumstances geofence warrants are impermissible. And that is a broad, broad ruling. To be clear, Your Honor, I'm asking this court to hold this warrant unconstitutional. But I understand Your Honor's concerns. In this particular case, it's not at all clear that law enforcement did exhaust all traditional investigative leads. Well, take the concurring opinion from Judge Holt from Fifth Circuit, the only circuit that was addressed this, and go on squarely to determine that this is a violation of the Fourth Amendment. First strong, Judge Holt writes in there that you're going to have instances in which the police may not do what it's supposed to do, or may not be able to get the information, but our framers knew that when they put the Fourth Amendment there. If you wanted to have instances where every time a crime could happen, you would have no Fourth Amendment. You would simply just go and search. But there is a search here. The problem for this court, and any court that addresses it, is understanding the technology. It is when you begin to say things like, well, it's location services as opposed to location history, and there's no difference. And you don't quite grasp the significance that, yes, there was some geographical limitations, but it included everything around it. Banks, churches, all kinds of people. It goes into a center bank. And it goes into the central bank. It's just data on every human being that's walking in that area there. They're not involved in this. This is searching. This is just doing a wide search. The United States Supreme Court has already spoken to it to some degree in Carpenter. You could have every argument you just had right there in Carpenter. Why in the heck can't they get the sales site information in Carpenter because the police couldn't do their job without it? But nonetheless, the court said there is a privacy right. There's an expectation. That's what we're struggling with here today. And we can grapple with whether we're going to try to do the police's job of doing this, or are we going to require them to simply follow the strictures of the Constitution to do that which is required under the Fourth Amendment? It doesn't mean you can't do your job. It means you need probable cause with particularity to be able to get information. And when we as a court begin to rewrite the Constitution so that we can allow law enforcement officers to do that which the Supreme Court has already told us they cannot do, that's a problem. That's a major problem, what we're dealing with here. But it is the understanding of the technology here, whether it's Carpenter or whether it's a beeper attached to the back of a car or whatever is going on in here, how far do we go? Because it does not stop here. Now, at the end of the day, in this case, this court found there was a good-faith exception. And it simply said, okay, that's a Fourth Amendment violation. Mr. Charter's gone no where in this instance, as did the Fifth Circuit. They found there was a good-faith exception to this matter. What it says is the next time you do this, do it in a way in which it has that particularity. And to add to it, for all those who think the sky is falling, Google's not doing this anymore. You won't be able to get this information. Whatever this tool you think is so important, whether Google owns it or not, they are not doing this anymore. They've changed. Because Google wanted to get out of the business of being law enforcement. We don't survey. We don't walk right by houses and put infrared lights onto a house, see heat in it, and say, okay, we know you've got marijuana, go get it. The Supreme Court said you can't do it, even though it turned up marijuana. So the result does not drive the means. And the manner in which we are discussing this today, that's exactly what's happening here. If we're going to do the police's job, then let's just declare the Fourth Amendment not existent and just say, anytime you want to do a search, just do it. And use all kind of legal nuances to avoid what is truly here under the case of Katz and all of the cases that follow from the Supreme Court of a reasonable expectation of privacy trying to protect the rights of individuals. But psychiatry is not the only one implicated here. There are hundreds, and they have to call millions and millions of people who are using it to eventually find out what's in that census database. And that tells you nothing. That just tells you there's a whole bunch of people out there. So there's a lot of other implications here beyond this, the police had a job to do, a woman was frightened, happens in all cases. But that's not the job of a judge in interpreting the Constitution, which protects the rights of individuals with unreasonable searches and a reasonable expectation of privacy. Your Honor, I think in the first instance, everything that we can say about location history and taking a tool away from police could be said about every other technology. The Supreme Court has considered as well. As you mentioned, Carpenter, the court decided that there should be a warrant requirement there. In Riley, the court said you need a warrant requirement, even though that might slow down a police investigation. Jones, the same consideration. So can I ask you about Riley? So the tagline at the end of Riley is if police want to search the contents of a cell phone, they have to get a warrant. But of course, the police got a warrant here. And I guess it seems your position on warrants is a little slippery to me. Is your position that all geofence warrants are invalid, which is what the Fifth Circuit said, or that this geofence warrant is invalid? Our position is that this geofence warrant is invalid. Give me an example of a geofence warrant you think is valid. I do not believe, Your Honor, that it is possible, at least in this construction, to have a geofence warrant. Give me an example of a geofence warrant in a situation that you would think is constitutional so that I believe you when you tell me that you don't really believe that all geofence warrants are unconstitutional. I guess I apologize for being unclear. We do not believe that it is possible to have a constitutional geofence warrant if it is operating in this fashion. So the J6 warrants, for example, were unconstitutional? Yes, Your Honor. I think it is impossible to get away from the initial search of millions of people. At the end of the day, this is a search. You're searching the haystack for a needle. You can describe that needle very particularly. You can describe its shape and its color, but you still have to search the whole haystack to get there. Is that a search or is that Google's process of getting to the search? So is your position that actual search is when they look at the millions of people who have location history clicked on their phone? Yes, Your Honor. Google here is acting as a government agent, as is Skinner, the railway executives. Everything that they are doing in terms of searching and compiling this information is only being done because of this warrant. They don't have this information just sitting around. That's what the fact is on the issue of a subpoena. What if a grand jury, federal grand jury up in Richmond, and the prosecutor, the United States attorney in Richmond, goes to the grand jury and discusses this case? You don't know what goes on in the grand jury. It's all secret. I can tell you from experience. They go there, they discuss the case, and the grand jury and the U.S. attorney decide to subpoena this stuff. Issue a grand jury subpoena. Subpoena dues is taken to Google. Come and bring with you. Now, what about that? Once again, Your Honor, these are not Google's business records. It is different from a bank if you're asking for transaction records. Well, they got them. They did, in fact, get them. They got them while they were conducting business, and they're the custodian of them. There's no other place to get them. So the grand jury issues the subpoena to Google. Is that constitutionally flawed? Yes, Your Honor. So the grand jury of the United States cannot subpoena this? Well, I want to be very clear. That's an investigative tool. Law enforcement. I mean, a lot of people would say in this situation, if they look at this, this detective ought to be given an award, detective of the year or something, for finding this bank robber. So we are not saying that. Ketcheney. Put him in prison, where he belongs. Law enforcement can get access to location history data. We are not saying that law enforcement cannot get this data. It's simply, we are simply saying that they must do so in a way that complies with the Fourth Amendment. Well, would the grand jury subpoena method satisfy that? No, Your Honor. I believe probable cause and award is required to get location history data. So the grand jury can't issue a subpoena unless they already have probable cause? Grand jury is an investigative body, and it's also a charging body, but they only charge after they get probable cause. Do you understand how they work? I understand what you're asking, Your Honor. Basically. They're investigating. Investigating grand jury. Why couldn't they do this? Again, these are not Google's business records. And if they can do it, why can't the magistrate judge do it, and the officer, and the court? We believe that award is required for this case. But it's the district judge rather than the magistrate judge. So is it correct? Ten minutes before and ten minutes after the bank robbery. Give us the data you have. And Google goes through and puts those limitations on its search of its data and comes up with data that implicates, at least one of the data, implicates the criminal. Is that, you think that violates the Fourth Amendment? I do, Your Honor. The records of sales of coffee during the period. Or they go outside and search the trash can for fingerprints. Do they need subpoena to go to the trash can? So I think, first of all, in this case, there is a big, big difference. It's a big difference because the data they're searching is a huge collection of data. But they're not searching the individuals. They're looking for the criteria, which is, one, within 150 meters of the bank, and two, within a half hour before and after. Now, that's very limiting. So you put those data in, and you come up with a very limited list. That's what they did in this case. And you're saying that's unconstitutional, which sounds to me like almost every police investigation that we've conducted in this country would fit those criteria. I mean, the problem here is created by the enormous breadth of the data bank. But it seems to me, if the data requested are very narrow, it's nothing more than asking the bank for the bank records. And the bank goes through its files and combs all its files to see which one belonged to the criteria being requested. Would a geofence warrant ever be permissible? It says not. Never, never, never can a geofence warrant be valid, in your judgment. Is that correct? Is your position that broad? Let me take a stab at answering both of these questions. I do think it... I was going to say that. I have. I do believe it is not possible to construct... I just need to address that question, because they're asking a very important question. And I'm not so sure you're correct on that, J6. When you're dealing with a particularized situation, if you have a vacant house out in the middle of nowhere, and you have someone that robs it, and that geofence just shows those who robbed it, that's particularized. That's what they're getting at. And the differentiation, that's not what you have here. You don't have that particularized location information, the particularized suspects. That's what the Fourth Amendment requires. It's the particularization of it. But don't walk into this trap of saying, no, you never can get one. Surely you can. If the geofence shows, as I said, a vacant house out in the middle of nowhere, it shows nothing but people going to that house, and they were robbers, surely that's got to be an instance where that's permissible, that you can do that. That's not what you have here. The problem with that is that you're not searching just the area around a cabin in the middle of the woods, or the area around the Capitol. You are searching... I'm getting no guidance from you as to when a geofence warrant would be permissible and when it would not be. I don't understand what the guidelines are. I don't understand what the circumstances are, the particulars are. You're coming across to me in the briefs and everything, you're saying that this whole tool is so impermissible and so violative of the Fourth Amendment that it can never be utilized. And that strikes me as a very far-reaching position. And he's correct if that's your position, but if you focus less on the breadth and more on what Carpenter calls the intimate details that it picks up, that may be where you're going on this. I think it is certainly capable of revealing quite intimate details. But at step one there's no intimate details revealed. There's no identifiable information whatsoever, so why is it even a search at step one? I think it is important to treat this warrant as a whole. The government certainly treats it as a whole and has repeatedly argued that the three-step process is constitutionally meaningless. The three-step process is the Google process. It's not a constitutional process. At step one, Google turns over information that is completely anonymized. Isn't that right? It is also eventually de-anonymized. Later, but at step one, the initial information is turned over. How can that be a search when there's no identifiable information? I disagree that it's not identifiable. At step one, it's identifiable? The government has said that they are capable of obtaining a subpoena post-step one to obtain all of the identity information for everybody in step one. So perhaps at that point, that becomes then a search. They also argue, as the government attempted to do in this case, to obtain step two and step three data on everybody returned in step one. So the idea that this is somehow anonymous is a bit of a fiction in this case, especially when you get to the data in step two, which puts people in a constitutional situation. At step two, then it becomes a search, and perhaps at step two, there would need to be a warrant. But at step one, when the millions of, as you were saying, bits of data are reviewed and then some number of them are turned over, perhaps at that point, that's not a search. Even at step one, Your Honor, you are revealing people's locations inside of constitutionally protected spaces. And even for a short time, a single trip can be incredibly revealing. Well, I guess you're saying that every camera on the street corner that picks up a person walking into the bank cannot be subpoenaed. A surveillance camera outside the bank, Your Honor, is so far from this situation. You just made a statement that even a single piece of data that identifies somebody is still too broad a search because you have to look through too many data. I believe even a single trip can be incredibly revealing, honestly, whether that is done in real time or historical. The reality of police investigation is to collect data of all kinds that are left behind at a crime scene. We're looking for fingerprints, we're looking for shell casings, we're looking for notes left behind, we're looking for camera video and so forth. They collect all of these data. These data are broad data. They don't necessarily link somebody up. But as they do the investigation, it starts pointing to more particularized people. The situation with electronic data, he left behind data while he was there. And those data are being searched. Now, the issue you raise is a correct one. That is part of a huge data bank. But that doesn't make it an illegal search if you say simply because you have to go to a large data bank to get the particularized data relevant to the bank robbery. In this case, identifying the persons who were within that small geographical area at that time is a very particularized deal. And when they search for that, they're not looking at individual human beings. They're looking at data, unidentifiable data that meet those criteria. Once those criteria are met, now you have a very confined data bank. You have an investigatory territory that can be identified that contributes to the investigation of the crime. But to just blanketly say because the data bank we're looking at is too large, we can never collect data on a particularized location at a particularized time. It doesn't make sense to me in terms of what we accept as police investigation. I'd be happy if you want to explain how. Happily. So here, what we're talking about is not searching the area around the bank. No, you're searching the data left behind during the bank robbery. It was not left behind at the bank, Your Honor. Sure it was. It was left behind. While he is in the bank, he's got a phone that's sending electronic singles that are recorded at that point. And those data would help solve the crime. And if you can particularize the request in the investigation to an area and a time that is relevant to the crime, that's traditional crime investigation. So here it is more like searching every house in the entire neighborhood. They don't search every house. But that is the functional equivalent. Just as Judge Berner says, it's just unidentifiable data. And the data aren't even searched. The data are separated by the criteria. So the criteria are 150 feet of this location. And as you know, the government gave the very specific location to the second on the global thing. And they gave a specific time, 30 minutes before and 30 minutes after. That is a very narrow group. Now Google puts those restrictions into its data and pulls out those that need it. Now we have a very finite and fairly small group of data from which they even required further particularization. But even the first step is not a search, except to the extent that you search for the file for Niemeyer and the ends in a file cabinet. You go down all the ends and you pull out, look at the ends until you get to see Niemeyer. And then you pull it out. And then they find I committed a crime. Except here, they're not searching by last name. No, they're searching by space and time. And the only way to do that is to go inside each house and see if the data matches that criteria. They separate the data. Unidentifiable data at that point. They're basically putting in two criteria. And in this case, we actually have the record of what they came up with. And that was still unidentifiable. The next steps were to particularize more. And in the final steps, very final steps, when they had the most particularization, then they put names to those. It seems to me that's very careful police work, protecting the interests of every other person. I would like to know, and this question's been asked to you, if you think there is any possibility we can search electronic data to discover a crime. Electronic data can certainly be searched in order to solve a crime. The only thing that we're saying here is that it has to comply with the Fourth Amendment's particularity of warrant requests. No, you said the geofence warrants are unconstitutional. You said that exactly. Unconditionally, you said that. I said I don't believe there is a way to make a geofence warrant constitutional if Step 1 searches every house in the neighborhood. That's what Judge Wilkinson said. That's about as broad as you can get. The geofence warrants are off the table for investigating crimes, investigating anything, regardless of how serious the crime. Terrorist activity. This is a terrible crime. A bank robber with a weapon walking into a crowded bank, scaring people to death. Do you realize just how broad your position is, what the full implications of it are? I don't think you do. I don't think you realize just how much you're taking off the table in terms of the tools that law enforcement can use in the most serious of situations. Just think about it. I don't think you understand just how broad the proposition you put before us is. And perhaps your answer might be we don't understand how broad the implications of what is being asked to be done. Google is not capable of storing information in any specific way. It doesn't do that. It does not know who the users are in its location history. It has 592 million people in a sense of all. Just like you've got people in this room, just like you've got people in Richmond, you know if a crime is committed in Richmond, Virginia, well somebody in Richmond did it. Because we've got 95 here and we know you're here. So what can you do? Start sweeping. And that's essentially what you're doing. You start narrowing it down and you fall into Judge Niemeyer's situation. Well, you can find this location. We believe they're in this area here. There's a thousand people over here. Let's look there. Let's narrow it in. Narrow it down. That's the search. And that's the problem that's here is the broadness is just what's happening here. That's why Google didn't like it from the beginning. What we have done is we have location history. That's all they have, location history. And it's of millions and millions of people. Then you begin to say, well, can you comb through it till we get to where we want you to be in a sense? And nothing is particularized about it because in the top of the factors that are there, all five of those that are met, those factors are met there. You can't show that it's this individual or that phone or anyone. You have a broad, a huge swath of people. And if we let this go, the broadness is going to be from this. And the Fifth Circuit recognizes it. Part of what we're dealing with here is we're dealing with judges who are confronting new technology and want to apply the most simplistic principles to it. To say, you mean to tell me if I find that it's right here, this guy is in this area, we can't use that data? That's not what's here. It's not a particularized data. It's 92 million people. Now, that's all you have. That's what Google has. It doesn't do anything with that. Then it becomes a law enforcement thing. Well, do something with it. Start searching Richmond until you find within that 92 million people, 592 million people, who is likely to be in the position of it. Who might be. Who could be. Who knows. No probable cause. Until ultimately you find something that comes of interest to you. And then you get to it. It's a reverse way of doing it. And it's what the Constitution doesn't allow. But if we do this, we're the ones who are going to be broad in it. And the broadness is not just on Mr. Chaudhry. It's on every citizen who is under the Constitution of the United States. You just deprived them of an individual right that exists in the Fourth Amendment. You, every one of you, sitting in here right now, can have your location data, I don't care where you are, and it can be put in a great pool and then you have no privacy whatsoever. Mr. Price, I think you might want to sit down after that. Thank you, Your Honor. Chief, can I ask one factual question before he sits down, just to make sure that I'm understanding the record here? Is it correct to say that in order for this localized history to be collected and revealed by Google, that Mr. Chaudhry had to opt in to that? Location history is an opt-in feature. I use opt-in and basically air quotes. Right. Our position is it was not meaningfully voluntary, that the opt-in screen, so to speak, did not meaningfully convey information about the nature of the information that would be collected. If he had not opted in, would his data have been available under this geofence warrant? No. And neither would anybody else within that area who had not opted in? Correct. All right. And only a third, approximately a third of the people that have these cell phones opt in. To this particular service, Your Honor. There are other location services that are common. They opt in. About a third of them. So he's in the minority of the people that opt in. I think we're talking about location history specifically here, but location services on a phone are a pretty essential feature of modern cell phones, as the court said in Riley when discussing why they were so sensitive. So I think, you know, here location services mapping is a quintessential function of a cell phone. And the requirement is not that people use location history specifically any more than the court considered whether, you know, everybody used T-Mobile in Carpenter. The proper comparison is to services of a similar variety, and I would submit that most of us use location services and store that data in some way. So we're talking about location history here, but that would be only the beginning. It's probably the informed situation. I mean, when you deal with it, the Google employee says, this is something, they say it's very limited, it's partially hidden. You're going to get it when you just open your phone up? People don't even know it? Who knows that Google has information potentially going to a back base that could be turned over to the government? That's not a part of anything here. Most people here don't even know they got it on them. There's nothing voluntary about this. The opt-in screens, Your Honor, did not even say the words location history. They said, and we're not even clear on this, but they either said saves a private map of where you go or said saves where you go on your device with a single button to click in. There was other information that was hidden behind a second screen that other people weren't required, people were not required to view. But we're really talking about one sentence on a pop-up. Well, everybody is not that ignorant about cell phones. On their settings, there's a privacy thing, and you can opt in on every program. You just go to privacy, and you opt in or out as to whether they're going to trace you. I've done it, and I'm Luddite, and I'm sure there's an indication that when two-thirds of the people don't opt in, there's a lot more information about that. If this bank robber was a thinking bank robber, he'd leave behind no evidence, no fingerprints, no cell data, nothing. He just wasn't a thinking criminal, and he made his ability to find him and convict him easier than maybe somebody else in a similar circumstance might have done. I think it may not be as easy as your Honor suggests. Well, I've got it. I think it's certainly gotten more attention since this case, but we have e-mails from Google engineers saying that location services and location history controls are difficult enough and confusing enough that they appear designed to ensure that nobody figures out how to work them. In that sense, it was a bit of a lobster trap. Very, very easy to opt in with a click of a button in the middle of the night and very, very hard to figure out from that point on that you've got it enabled or how to turn it off. Once it's turned on… Well, apparently two-thirds of users figured out how to do that. I think it may be possible that they didn't opt in at the first time or clicked no, but what we're talking about here is collection that occurs every two minutes regardless of what you're doing on the phone. You may be asleep. You may be in the shower. At least when you're talking about cell site data, you're making a phone call or you're receiving a text message, something to indicate that you might be disclosing this information. Here, it's a click of a button and then forevermore, every two minutes, your precise location logged without any interaction from the user or any warning that this remains enabled. Thank you, Mr. Price. Thank you, Your Honor. Mr. Judge, the good news is I checked my docket and the case is United States v. Chaudhry, not United States v. Neymar. Well, I was waiting for that. Good morning, Your Honor. May it please the Court. I'm Nathan Judish on behalf of the United States. There are three bases on which this Court can affirm the district court's denial of Mr. Chaudhry's suppression motion. His lack of any protected privacy interest… Can you put that microphone a little closer to his feet to speak up? His lack of any protected privacy interest in any of the location information disclosed pursuant to the warrant, the validity of the warrant, and officer's good faith reliance on the warrant. So we very much agree with the panel's analysis of Mr. Chaudhry's privacy interest, but given that the Court thus far has focused on the validity of the warrant, I'd like to be in with that. Do you understand the panel decision is vacated? I understand that, Your Honor. I'm just endorsing its analysis. For the lack of the district court's opinion. Yes. And, again, it's entirely appropriate to affirm on any of those bases. So the warrant here complies with the Fourth Amendment because it was supported by probable cause and because it specified its objects with particularity. The affidavit established that there had been a bank robbery, that the robber appeared to use a cell phone, and then explained why it was a reasonable inference to believe that Google would have information related to the robbery. And that information included not only identifying the robber, but also the investigators were interested in more of a spatial-temporal understanding of the crime scene, identifying witnesses, and there was really more than a fair probability that the warrant would identify evidence of the crime. It specified its objects with particularity because it included narrow time constraints on the information that could be obtained, and it also included an appropriate temporal limitation. Limitation is not the same thing as particularity, is it? You said limitation, is that particularity? I mean, for example, limitation says this room, is that particularity less than terrible crime? The particularity requirement requires that the warrant specify evidence of crime and that it establish probable cause to believe that that evidence will be at the place searched. And so I think the limitations... I'm sorry, I didn't mean to interrupt you, but are you assuming for purposes of this answer that the place searched is Google and not the 19 people whose data were involved? If you're saying this was enough to justify a search of Google, I totally understand what you're saying, but I don't see how it's enough. You're trying to sort of put to one side the question of who has an expectation of privacy and was this a search. But if you conceive of it as a search of the 19 people who made it to step two, then I don't see how that is justified by saying there was a likelihood they would find evidence relating to the crime when they got this stuff from Google. I think that everyone whose information they got was within the limit of the warrant going to be evidence that related to the crime. So there was probable cause to all 19 of those people? And this is I think where the district court went wrong on this. The Supreme Court said in Zurcher v. Stanford Daily, which involved a warrant to search a newspaper premise... But that was as to the Stanford Daily's privacy interest, so they stood in the same shoes as Google, and I'm giving you that. There was probable cause to go to Google and to believe that Google would be able to give them evidence of the crime, but the kids in the Stanford case, they had no privacy interest in the photographs that were taken of them out in the open. So there was no sort of third party to worry about, but again, if we think there was a search as to those 19 people, I'm not seeing how Stanford Daily helped. I think with respect to those 19 people, they're potential witnesses to the crime. And the warrant was drawn in a way which limited it to people who were in the area of the crime at the time of the crime. So basically the warrant was after the bank robber, it was after his co-conspirators. There was some evidence that there would be co-conspirators. There was his ransom note spoke of these boys on the outside watching, and it was after witnesses. And all of those things are appropriate. Wait, did the officers...am I correct? The only person whose personalized info they ever got was Mr. Chaudhry? In the three-step process, the step three, they went for identifying information for three people. One of whom was the perpetrator? Were the other two people ever interviewed? That's not in the record. You just said it could be justified that we're looking for witnesses. It seems a little strange that we didn't actually go and find any of those witnesses. It just so happens the only person we seem to have gone and found is the perpetrator. I mean, had the case gone to trial, I don't know who the witnesses would have been, the people who were present at the crime scene. But I think the issue when we're seizing evidence pursuant to a warrant isn't like... Another thing we know from searchers, there's no necessity requirement for the evidence that we're getting pursuant to a standard search warrant. Wouldn't a warrant need to be more specific to say that you're looking for witnesses or co-conspirators? It just says the bank on the cell phone. That's in the affidavit. That's among the things that we are interested in. And so the magistrate in this case looks at the warrant. It was the state magistrate, right? Yes, that's correct, Your Honor. That's correct, Your Honor. And so the magistrate looks at the affidavit and the evidence that we're going to seize and makes the determination that the information which falls within the scope of the warrant is evidence of a crime. And here I think that's a very reasonable... Mr. Judge, can I follow up on Judge Harris' question? So at Step 2 when the warrant is narrowed to the 19 individuals at Step 2, we're still talking about anonymized data at that point, right? That's correct, Your Honor. Is that legally significant? We don't know who these people are, so the police don't know. It's only at Step 3 where they actually get the identifying information. I mean, I think for purposes of validity of the warrant, the question is whether it's evidence or not. I think the differences between the anonymized information and the identifying stuff may be relevant to the ultimate question of whether people might have any expectation of privacy infringed. But anyway, did you answer that question? I didn't understand it. Did you answer the Chief's question in terms of how do you get from 19 to 3? The 19, what was it about them? What did you have about them? So the way the warrant worked is in Step 1... How do you get from 19 to 3? That's what I'm asking. What is the particularity that drove 19 to 3? So the warrant had a three-step process in which the officers were instructed to look at the information they obtained from Google and decide what additional evidence they needed beyond that. So they get the whole batch and they decide, I'll throw you out, I'll throw you out, I'll throw you out, I'll throw you out. So the 19 weren't thrown out in that cut? The officers are seizing evidence of crime as they go along. Evidence of crime? What you have evidence right now? People using their phones. People using their phones. Citizens, non-citizens, whomever they might be. That's what you have. You weigh it down to, I'm talking about the 19. What was it about them that made them suspicious that would be consistent with your particularity? That's what we need to get to. That's the part I don't understand. The 19, that's where the detail is. How were you able to get from 19 to 3 with the particularity you had as to a crime? A probable cause or particularity. Right now you have people who are just using a phone in your perimeter. But the 19, tell me how did you get from 19 to 3? Did you know about them as particularity? The warrants instructed the officers to examine the data from the first death and make a determination. What did they find out that made them leave from 19 to 3? At that point they're trying to make assessments about what the role of people are in a crime. For example, if there would have been a co-conspirator involved, there's a reasonable probability that they would have met up afterwards at some remote location or something like that. They're looking at the evidence they've obtained so far. When we get from 19 to 3, we're not just looking at this one hour snapshot inside the bubble. We're going backwards before, outside the bubble, we're going after. We have 19 of them and we follow them for the next two hours. Two of them drove 30 miles away and then they were right next to each other. When you say evidence they're co-conspirators from meeting up, what you're talking about is following them after and outside the bubble. That's moving on to the step two location information. So we're not just looking at 19 people within this bubble during this hour. We're actually going back in time and looking where they were before and we're going after and we're looking where they were after. That's correct, Your Honor. The step two information looks at where they are over a two-hour period regardless of it. We start entirely with the set of people who are within the bubble at the hour of the crime, but then the step two contextual location information gives more information to law enforcement, which enables officers to have a better understanding of the role of people and what happened at the crime scene. And wouldn't you think that you would need another warrant at that point at each step? I think it would be permissible to get another warrant, but I think it was a reasonable determination for the magistrate to make the determination initially that the two hours of location information about people who were present at the scene of the crime, at the time of the crime, would be evidence of crime. Yes, and I think it was appropriate for the magistrate to make that initial determination that two hours of location information would be evidence of crime about people who were present at the crime. Were the accounts identified by person or were they still just numbers? Step two continued to be anonymized number information. The only personal identifying information came in at step three. But wasn't the step two data sufficiently particularized that law enforcement could use public information to then cross-reference and individually identify those people at step two? I mean, did step two track people's location for two hours? So if somebody went into their home, the government could use property records to identify that person. If somebody went into a place of work, the government could use LinkedIn to figure out who worked there. Isn't that right? Yes, certainly that kind of additional investigation would be possible, and it might be possible to identify people in some circumstances, but people don't only go into their own homes. Often many people live in their own homes. But yes, it is certainly true that the step two information could potentially have been used through further investigation to identify people. Now these three steps, are they specified in the warrant? Yes, these three steps. You claim they're not specified in attachment two? Yeah, the warrants. At JA 110, 111? And they aren't called step one, step two, and step three? It's not called the place, person, or thing to be searched? Yes, it doesn't say step one, step two, or step three. The warrant doesn't say a thing about step three, step two, step one. It doesn't say there's three steps. It has a bunch of bullet points. It tells them what to do. And that was created by the court based on the request for the warrant? Yes, the warrant was issued by a court, and those are the correct representations. There's nothing in the warrant that talks about what you're talking about, step three, step two, and step one. No, it lists a series of bullet points which specify that process. It seemed to me that it hasn't been much discussed, but the Miller and Smith cases have at least some applicability here. And I think it was in Miller the government was making a request for bank records. And I would think that in terms of the privacy interest involved, that the request for one's bank records was frankly more intrusive than the request here. And yet even in the request of something, a case of a request of something as personal as bank records, the Supreme Court said third-party search doctrine would apply and negate any Fourth Amendment violation. But those two cases, Carpenter never overruled them. Those two cases must have some applicability here. Absolutely, Your Honor, and I'd like to point out a couple of... The circumstances were really much more intrusive than what we're confronted with here, but the Supreme Court did not back off from the third-party search doctrine. Right, and both of those cases involve, you know, businesses with access to large databases and having to produce to the government very limited sets of that information. I think it's worth noting here that this location history information that Google has is, in fact, a database that Google uses for its own business purposes. They use it to do targeted advertising. They use it to provide various services to the people who sign up, things like help with your commute. So it spots if there's a traffic problem at a place you're likely to go and tells you that kind of stuff. But how does that differ from the databanks that many businesses compile? I mean, a bank may not have the extensive database that Google has, but a bank has extensive data stretching well back. You can learn a whole lot more from a bank record about somebody's habits, somebody's financial history, who somebody's writing checks to, pay to the order of such and such. You can learn one heck of a lot about an individual and the way they conduct their lives by collecting their financial records and by collecting their bank records. And that's much more intrusive than what's at issue here where we're talking about a limited public space and we're not divulging an individual's habits or friends or associations or what have you. And even in the face of a request by the government for the bank records, the Supreme Court was emphatic and said there's no violation. And I think we're bound to respect the Miller and Smith decisions because they have a very direct applicability, it seems to me. I think that's absolutely right, Your Honor, and that goes to the fact that Mr. Tatry had no protected privacy interest in any of the information disclosed here. He disclosed to Google in order to obtain location-based services, and that makes it very much different than Carpenter where the location information was just collected as a secondary background aspect of providing the communication service. So can I ask you how far that goes? Does that include, say, hypothetically, my Google Photos account, too? I don't think so, Your Honor. My Gmail account? I'm not an expert on Google Photos, but I know with your Gmail, Google just stores your Gmail. They don't use it for any kind of business purpose at all. They don't even do targeted advertising for it. And so if you provide just a pure storage service, I think it's not disclosed to the phone companies. Are you stating this for the record, or this is your opinion? If you look at Google – Are you stating it for the record, or that's your opinion? That's what Google says. Then the record? I mean, because we're deciding this case, and you're asking if you're an expert. I mean, I just want to know. I'm not attacking you. I'm just saying, do you know? Do you really know? Do you really know? You don't, do you? It's what Google says. You can read it online, and their description of their services. And that's the way to tie this case on what we can read in the newspaper or online, Internet. I mean, we talked about the Constitution. The framers were some very smart people. You know, to tell the truth, they didn't trust government. That's why we have such a beautiful Bill of Rights. It says, no, you can't come into my house. No, you can't search. You've got to have probable cause. I don't care how much crime that occurs. I've never heard any court say, because of the seriousness of the crime, we can just throw away the Fourth Amendment. My question is this. When you actually have searched defendants here, it started with the geo-fencing and all those things. But what did you have other than just the start of it there in that fence, in that perimeter, trying to particularize crime against those three people? I just want to know, were they equally as potentially culpable, or did someone just make a decision, well, this person here seems like a nice person. They live in a nice neighborhood section. This person doesn't. I'm going to go after this person. I just want to know, what was the metric? Because that's the detail. That's what the framers were talking about. That's why there isn't a general warrant. There's certainly a general warrant from the beginning. And you were saying it went down to Step 1, Step 2, Step 3. But when the rubber hit the road, what was the particularized difference between – I couldn't get my 19 to 3 answers, so give me the 3 answers, 3 to 1. What's the 3 to 1 answer that made one person more particularized than the other, other than the fact that police officers sat around and said, you know, based on what I know, the demographics of people, where they live, this person's unemployed, this person's race, this person's religion, I'm going after this one. That's what the framers didn't want done. That's why the Constitution stands as a bulwark. Tell me what the 3 go to 1. Well, as far as how they knew it was Mr. Chatterjee, the robber, is that the location information in Step 1 alone was sufficient when correlated with other evidence they had, like the videotape at the scene of the bank, to figure out that he was the robber. So that's how they went. So you knew he was the robber? From Step 1. What about the other two? Why were they still in the vast? What the investigators are going at going forward is to try to discern people's role in the crime and so figure out, are they witnesses, are they co-conspirators? And so it's not that people assumed that they were guilty of anything in this. Remember, we're allowed to see the evidence of the crime, and that can include certainly who is the robber, but it's also potential witnesses. And really the key point of the narrowing down process is to try to determine who is what. And so they looked at things like if you were on the scene for that whole first hour, 30 minutes before the robbery and 30 minutes after the robbery, you aren't going to be the robber or co-conspirator. You're not going to be any innocent person. Those would be witnesses. Any innocent person. It could be, yes. But that's the whole point. I mean, the net is pretty broad. Again, it's appropriate under the search and review standards to collect crime scene evidence and look for to figure out who is a potential witness of a crime. We also have the Supreme Court case involved that says it's actually okay to put up a roadblock a week after a hit-and-run, at the site of the hit-and-run, for the purpose of finding witnesses. The Fourth Amendment permits us to look for witnesses. Counsel, it may seem semantic, but I am just trying to figure out about the witnesses. I know the cases that say the police can look for witnesses. Are there cases saying the police can search someone on probable cause that they are a witness? I'm not familiar with that one. So I would say that Zurcher v. Stanford Daily is the case which says explicitly that it warrants to search for things rather than searching to see things of people. You do not need probable cause for any third parties implicated that they're involved in crime. Right, and that's why they can search Google. But just assume hypothetically that I think once they start following those 19 people out of the bubble, seeing everything they've been doing for two hours, whether it's inside their own homes, in the church that's nearby, wherever they are, they're going to know where those 19 people are. If I think those 19 people were searched, is there some case I can go to that will tell me, oh, yeah, if you're a witness, you can be searched? Not a warrant case, there's the traffic stop case. Those were not searches, those were stops, and the court was very clear about this. It's the most modest intrusion. It's a stop. They're doing it to everyone, not to 19 people. They're doing it to everyone. It's a momentary stop. Nothing in that case says you can search the people in those cars. Yeah, I just think in Zurcher v. Stanford Daily, you had searches of every reporter's premises, and none of them were involved in the crime, and the Supreme Court says that's okay. What matters is, you know. Counsel, what concerns me is, again, the sheer breadth of what is being proposed this morning. I wonder if we are not going down the road where any request from government, from any private company is now going to be, for data from any private company, is now going to be constitutionally suspect, because every private company keeps data of some sort. And if we're saying that even data that's voluntarily provided, as it was here, to that company, if the government so much as requests that, then that's constitutionally suspect. And in most cases, the data would be provided to the government in a far less anonymized form than the government was provided in the early steps of the Google search. And if we say that even anonymized, largely anonymized data is constitutionally impermissible, then how much more constitutionally impermissible would be any government request from any private company for the data that they keep, all of whom, all of those companies keep that data. And so this is, the implications of this could not be more broad. That's why there's nothing limited and narrow has been put before us. The propositions that have been put before us don't have an easy limiting principle. That's all I'm saying. I think that's absolutely right, Your Honor. I mean, one example of this is if the courts accept the Fifth Circuit's notion that it's impermissible for a private party to do a large database search before disclosing information to the government, and that's what's traditionally happened with just telephone subpoenas. When you subpoena a phone company for everyone who called a particular phone number, sometimes the phone company has to, you know, query through every call in its database. How is it different from carpentry? I mean, where we are today, and again, I think this branch of government is probably the least suited to address technological changes that are happening every day. And the kind of broad implications, we're moving into a world of AI. Every bit of that is going to be accessible by law enforcement, whether you use JetPG, Microsoft, Partner, whatever you use, all that's continually mushroomed. The Supreme Court recognized it when it dealt with a case in which it said criminal defendants have wireless carriers for cell site location information, and as a result of that information, they were able to identify four robbers, which the Circuit Court said they appeared. The Supreme Court reversed, and even though you had four robbers that you could have stopped, the Supreme Court reversed it, and it did it. Now, here's the thing about the robberies. Let's think about what did you just do. You went and accessed all of this cell site information on these individuals, and then you went and produced maps as to where they were, and then you identified the phones of these robbers. The Supreme Court said you can't do it, and yet we want to right ourselves around Carpenter and where this is going because the implications here are far greater. But let me just say this. We don't have to even go here. We can deal with this situation as it's before us, but as I said, in this particular situation here, Google isn't doing this anymore. Is that correct? Google has announced plans. They announced plans a year ago. You can't get this information from Google like this anymore. You can still get it. You say that's irrelevant. It's obvious. I mean, it will have a perspective effect going forward, but Google is— Did you say that the government, the court, that is, the U.S. attorney and the grand jury, have done the same thing where the grand jury subpoenaed the suspects, sought the same information? Well, Google is going—is changing the service. Well, I know. They won't have access to it. What? The information, this was made subject to a search warrant, but hypothetically, couldn't the grand jury have issued the same request by way of subpoena and security? I think, actually, because of the Stored Communications Act, probably not. The Stored Communications Act limits the scope of what the government can get pursuant to a subpoena. Counsel, you were asked about, Judge Wynn mentioned Carpenter a second ago, and do you have a position as to why this case isn't prohibited based on Carpenter? Can you explain what's different about this? Well, yes. First, Carpenter said to get a warrant, to get long-term sales-side information, and here we got a warrant. But also, regarding why the third-party doctrine applied here when it didn't in Carpenter, the Supreme Court cited three reasons in Carpenter why the third-party doctrine wouldn't apply. First was that the information was collected automatically, simply by powering on your device. That's not true here. This requires an opt-in. Second, the Supreme Court said that you had no ability to delete your information when it was collected by the phone company. That's not true. Google explains from the very start, from its opening scene, when you opt-in to location history that you can go online and delete it at any time, and then it's quickly gone. And finally, they said that the cell phone use, the Supreme Court said in Carpenter, that cell phone use was essential to participation in modern society. Google location history is a nice little service. It provides a few useful features. It's not essential to participation in modern society, which we know because two-thirds of its customers don't opt-in to Google. So Carpenter did not adopt this way. What about the factors that cut the other way? The fact that location history, in this instance, unlike in Carpenter, with the cell site, is collected every two minutes automatically, and is more precise. It's done within minutes. Cell site location is kind of all over the place. And unlike the cell site information, it follows these subjects right everywhere they go, even through walls and moving through private spaces. And then this geofence is a sweep. It sweeps and gives you location information on an unlimited number of people who were previously unsuspecting of anything. I mean, there are some factors here that cut both ways with Carpenter. But the end result is to understand where Carpenter and the Supreme Court have recognized where we are in this technological world. And if we write an opinion, we cannot do so devoid of the belief that it's not going to affect some other areas. It's affecting all kinds of technological advances. And even as we're speaking, it's changing right in front of us. And as I said, maybe we're the least suited brand to discuss this, because everything we're getting right now, we're just learning from the record and learning here. This is the most basic level of knowledge you can get on technology in front of a group of individuals who have probably no really technical experience of knowing where it's going or what's happening here. The Supreme Court is very careful in dealing with it. That's why increasingly courts are beginning to approach this subject very carefully. And because when you seek into the end result of solving a crime, the way to do it is just get rid of all the Bill of Rights. And you can solve a whole bunch of crimes. You just go around and you can torture. You can do all kinds of stuff. You don't need any rights to do that. But we've got the Fourth Amendment. And if it's going to mean anything, this movement in technology, and as I mentioned, AI, is huge. And it is no question in my mind this is going to apply to it. And to what extent are we going through an opinion here? You talk about broadness, it's going to cover everybody, every phone sale, every time you get on a computer. You can't even look at a computer screen and say some words, and all of a sudden you see the product popping up in front of you that you just were talking about. You didn't even write anything or say anything. And it's all there. All this data is there. And yet the question is, why can't we get private businesses to give us this information on individuals? It doesn't mean anything until it hits home with one of us. And that may have been the case when you attach a GPS monitor to the back of a car. I mean, for the most part, it probably doesn't mean anything. But you begin to realize you could attach it to anybody. And that's what we're dealing with right here, is the broadness of where we're going with this. But what is wrong with just getting a warrant that's particularized? That's the requirement of the Constitution. It doesn't mean the police can't do the job. It means particularize the information you are seeking, rather than searching in a broad sweep everybody out here until you finally get something that says, okay, good, they had this information all the time. I told you, as I said earlier, if you look at the city of Richmond, you can say a crime is here. Well, we'll search everybody in Richmond until we find out information that would implicate someone. And surely you cannot. I think the warrant here is particularized because it's really quite similar to getting video surveillance of the crime scene. And it was particularized by time and space, in a way, which appropriately narrowly linked it to this bank robbery. There's a big difference between a video surveillance, which shows you the exact people there, and this that has 592 million users in this vault that Google maintains, for which then you've got to use some methods to extrapolate what's going on in there. And I just told you, you could be sitting here talking, and if you say something like a car, that car pops up on the screen. It means they have the capability of finding out what you are doing every day. They can find out your religious activities. They can find out your sexual activities. They can find out everything about you if you allow them to get into your data and go all the way to find out everything about a person. And that's where we are. And this is simply saying, well, just turn them loose. Let private industry just go in, pull up all the data, and when we have instances of things happening, we can locate it by letting them just do their thing, do the job of law enforcement. That's what the Supreme Court prohibited in Carpenter. Again, Carpenter just said there was an expectation of privacy. It didn't address warrants. But I guess I'd like to address two points about why it's appropriate to do this with a warrant. One is that Google essentially does geofence warrants on its own as a matter of business purposes. The Call Federal Credit Union here could have done a radius or could do a radius-targeted ad for people who are within a kilometer of the bank. And Google would look through all of its hundreds of millions of customers and find that tiny subset of people who are close to the bank. And then it would use their location history afterwards and do store visit conversions to see if during some period of time they actually visit the bank. And to me, it seems like the government ought to be able to do, pursuant to a warrant, what Google is. They don't reveal where your body is. They don't reveal the location of the person. They don't reveal the intimate details of the individual there. There's a difference in a bank record and what you're dealing with here. This does. And the second point I'd like to make about why this is appropriate is that one of the fundamental Fourth Amendment rights shouldn't depend on a company's internal database practices and organizations. And here, the reason why Google has to filter through its entire database to find the set of people who were at the site of the bank during the robbery is because they've made an internal decision not to index their database based on location. They could do that if they wanted to. And then they would just be able to quickly look up exactly who was at the site of the bank robbery at the time without having to do this big computationally strategic process. I don't see this in your brief, but do you know what happened in Carpenter itself when the case was remanded in the Sixth Circuit? It was held up... Didn't it suppress the evidence? No, on good faith. So it was good faith reliant. And certainly, in this case, the good faith exception is another reason for this court to affirm the denial of Mr. Chaffee's suppression motion. If you apply the standard Lee on good faith factors, here the warrant was not so devoid of probable cause or a particular area that officers couldn't rely on it. I mean, even the district court acknowledged that there was a fair probability that officers would be able to identify Mr. Chaffee. As far as particularity, you know, you look at the picture of the bank and the circle around the bank, and it's clear officers were trying to get information which is appropriately tailored to the crime here. And what's more, you know, even... Judith, can I just sort of follow up on that in light of Judge Wynn's thoughtful remarks about the uncertainty of this technology, the perceived incompetence of judges in being able to deal with it, and the notion that perhaps what we need is a legislative fix and not necessarily a judicial one. And that gets to the point you just made about good faith. It seems to me that the easiest answer in this case is to leave this for another day and say that given the uncertainties of what the officers were faced with and the magistrate, they made a good faith effort to comply with the Fourth Amendment as they understood it. And even if they might have been wrong, they weren't quite so wrong that it warrants suppression and leave this issue for another day. You know, that's certainly something the court can do, Your Honor. I do think in light of this circuit's decision, some clarity on the validity of the warrant would be helpful to law enforcement going forward in this matter because this impacts not only Google geofence warrants, which, by the way, I didn't answer that question earlier. They continue. We are still getting geofence warrants. Well, we're not going to get clarity. We're just going to get, well, depending on how the court decides, we may get more confusion, not necessarily clarity. Then there's a mechanism for clarifying beyond this court, Your Honor. On the good faith question, you all argue the officers consulted with the prosecutors. Yes, Your Honor, and that's important based on this court's previous decision in the McGlann case. Yes, I agree. But did they consult with both the state prosecutors and the federal prosecutors? I think the record says that the detective here had consulted with federal prosecutors on geofence warrants. They consulted with the federal prosecutors. So that was with the United States Attorney in Richmond. Yes, people in the United States Attorney's Office, they had consulted with them. The United States Attorney covered all. Yes, Your Honor. Yes, Your Honor. And, you know, even the Fifth Circuit, which obviously found and held that geofence warrants were unconstitutional, relied on this court's decision in McGlann to hold that suppression was inappropriate for the geofence warrant in that case. So I do think it's appropriate here for this court to reject suppression based on good faith. Thank you, Mr. Judas. Thank you. Yes, the court affirmed that this, of course, Mr. Price. Thank you, Your Honors. I just want to make a few points here. And I would love to talk a bit about Step 2, because I think we spoke a lot about Step 1. And even if you put Step 1 aside here... Who created the Step 1, Step 2, Step 3 terminology? It's not in the warrant. The terms Step 1, Step 2, and Step 3 are not in the warrant. Those are the terms that we've used to describe it. Who used them? You say we used them. Who created it? The prosecutors or the defendants or the judge? Did it come out of... I don't know. According to the record here, Your Honor, the geofence warrant process was created by... By Google. It was created by the Department of Justice and the Computer Crimes and Intellectual Property section of the DOJ working in consultation...  It was the DOJ working in consultation with Google that came up with this. So the DOJ and Google had already contemplated this and considered presumably the potential Fourth Amendment issue. I think that's actually very relevant here, Your Honor. I'm not going to say it's not relevant. I just didn't know it would have been created. I don't know if anybody said that. I knew that it was in the briefs. It wasn't in the warrant. I just wanted to work on it. It's relevant here, Your Honor, because this was not a one-off situation where an officer just tried to do the best that he could under the circumstances. This was a pattern in practice. Geofence warrants began in 2016. By the time this warrant came around, there were about 25% of all warrants that Google got, and they're mostly using the exact same language. The Department of Justice created a template that was used in this case or a variation of it used in this case and many, many others. So to say that this was just Officer Hilton trying to do his best or he didn't know how many people would be searched or didn't know how it was going to work, I think brings a little problem. Well, did he have any judicial authority or indication that there was something wrong with the use of the warrants? I mean, that still was uncharted territory as far as the courts were concerned. There hadn't been an opinion about geofence warrants, Your Honor. Well, that's exactly right. He went and talked to the lawyers. He went before the magistrate. So to say that this has been around a while and he should have known better is just not correct. As a point of fact, Detective Hilton did not consult with prosecutors in this case. Apparently, he had obtained two geofence warrants prior to this case in which he consulted with prosecutors. But no data was ever obtained in those cases. And the detective did not, in fact, consult with prosecutors in this case. Counsel, right before you sat down the first time, there was some discussion about whether your client had agreed effectively to the disclosure of this information, essentially the third-party search doctrine. And you gave us your position why you say you don't think that applies, why he hadn't really consented. Assume we disagree with you on that point. What's the implication of that to your position? So I guess two things here. On the assumption, it's not my opinion that it was not meaningfully voluntary. That was the district court's finding as well. I'm not going to debate that. I'm really trying to get to that point. I asked you to assume it, not tell me why my assumption is wrong. Voluntariness, in terms of the third-party doctrine, is only one problem. And I would argue it's not even the controlling problem. That's what Carpenter teaches us. So even if this may be slightly more voluntary than Carpenter was, you have to look at the nature of the data being searched. So you think even if your client, if we find he voluntarily agreed for it to go to third parties, we should rule in your favor? I still believe so, Your Honor, even in the same sense that I voluntarily store my Gmail with Google as well, but that doesn't destroy my expectation of privacy in it. So imagine the most conspicuous warning in the world. Imagine that before you do it, like turn it on, and then it says, are you sure, big bold letters, Google is going to relentlessly data mine everywhere you go and keep it forever. Are you sure you still want to do it? And the box is default on the highlighted, and you hit highlight. And then it says, are you sure? And then it says a whole bunch of things, and you say yes. You think even that? No, I would agree with you, Your Honor, that there is some form of language or warning here that could properly put people on notice about the scope and precision and relentless collection. So you're saying in that situation that consent would be fatal to your claim? I think if you had a big warning and flashing letter saying, you know, if you use this service, we're going to tweet out your location every two minutes, then yes. That's fine. But the implication of your argument then is consent matters. I mean, you've got arguments why we don't have it, but you either have it at some point or you don't. There's either a decision on that or there's not, right? So I think it matters in the sense that it's one of two prongs. It's certainly for the third-party doctrine. It certainly wasn't determinative, not in Carpenter either. Mr. Carpenter signed a contract with the cell phone company. But the court said he didn't meaningfully consent. In Carpenter, correct. And in this case, in the district court, found the same.  But if we disagree and say he consented, I'm just trying to see. I mean, you've got a lot of arguments why you went on consent, but it sounds like in Judge Hyten's example you agree that if you do, if we're clear on that point, that's the end result of the analysis, then you can't prevail. I think there is some level of warning that could, in fact, destroy your expectation of privacy. I do not believe that was the case here. And you absolutely have to consider the nature of the data being searched here, just as— Yeah, I'm just trying to understand structurally. I got you. Thank you. I do want to speak a minute about Step 2 here because we didn't get to that. And I do think it is exceedingly important to recognize the amount of discretion that law enforcement had at Step 2 and at Step 3 to decide who would have their data searched and seized further for an extra hour on either end. There was no process to go back to a court to obtain a second warrant. There was no judicial oversight for Step 2 or for Step 3. That is the kind of—and the district court called it unbridled discretion that this warrant granted to law enforcement here as the definition of an unparticularized warrant, where the judge is, in some sense, putting the rubber stamp on the warrant application, leaving it to law enforcement to exercise their discretion over what to search and seize. And I think that the other important part to recognize about Step 2 is the lack of anonymity in that data. Here we have some questions. Well, what happened to those 19? Who are those three people? In Step 2, we actually had our expert at the district court level look at that Step 2 data and identify people based on where they had gone. One of the individuals who was ultimately revealed here was— But wouldn't that individual have to be the complainer? In other words, Mr. Chattery would have to complain that he was being identified in some improper manner. But the fact that it identifies—they've narrowed it down quite far. It's like investigating any crime scene. You try to eliminate people who are potential. Sometimes they're look-alikes. They have lineups. There are all kinds of methods for excluding people. But the Fourth Amendment is personalized to the person, his house, and his effects. And Chattery can complain. But it seems to me your argument isn't a complaint by Chattery. It's a complaint by one of the three third persons who were examined in that narrowed-down process. Mr. Chattery certainly is complaining here, Your Honor, to be clear. But I think—and it did, in fact, track him to his house. In Step 2, there are four or five little dots right on top of his address on Masondale Lane. So it certainly found him in a protected space. And I think—I'm sorry, Your Honor. I just blanked on your question. You acknowledged what I—I think we agree on that. What I was going to say is I do believe context here matters. The nature of the search is something that can inform the court's consideration of it. In the same sense that, you know, a traffic stop may or may not be justified individually, but perhaps in a checkpoint situation, it's different. So it's the opposite. My whole point in most of my questions has been we're not in an ongoing search process. We're trying to uncover historical evidence, things, markers that were left behind. And in investigating a crime, investigators go various places. In the electronic age, we have these electronic data that historically preserve where this man was at a time and a place. The charge is that the search will go too broad. It will get him at times where he's not even relevant or while he's vacationing or whatever. And my whole point has been that with respect to electronics, we've got to have a mechanism to narrow it down to what's relevant to the investigation of the crime. And in this case, it seemed to me that when the police said the crime occurred at a particular hour and we want evidence relating to that time and that place, and they made every effort to narrow it down to that, Mr. Chattery shouldn't be able to complain about that. It's a little bit like complaining about the fact that they test the gun casings or that they pick up fingerprints, even though the fingerprints, he left those behind. He left, if you accept the question that he left on his information on his service location data, he left that on. And basically those are data that the police collected and helped identify him as the culprit. And it seems to me if we're going to take away that under some notion because the data bank is huge, that's a little bit strange, it seems to me, isn't it? Well, I believe that law enforcement should be able to access an individual's location history data. What we have here is akin to a digital all persons warrant, like the situation in Ybarra. No, that's just an overstatement. The investigation was of persons who left behind cell data within an hour in a circle of 150 meters. That is a very narrow request. They do not want 5500 million people. They don't want people in Maine and Washington State. They want the people at that time and at that place. Now that narrows it down enormously, but that's an investigative technique that we have to have in our society. And the Fourth Amendment protects the person, his house, and his personal effects. It does not protect the government's going to other persons to ask about him, where was he. It doesn't protect against them going to the bank and asking about that. It protects him and his person, property, and his house. And in that sense, he's entitled to have the search focused on where he was at that particular time and place. I don't know why we would suggest the data is complex now because it's electronic, but why we can't apply the traditional police techniques as long as we narrow the electronic data to what's relevant to a proper investigation. Even if we put aside the search at step one, I think what we have here is, first of all, an incredibly broad geofence that covered not just the bank, but the entirety of a church next door. And if you consider the effective range of that geofence, how far they actually track- If he didn't go to his house, he robbed a bank, and they were trying to find evidence. Now, if he ran into the church for refuge, it would be relevant to ask the priest, did he come in here? Now, the priest may not say so. Or if his wife said he ran into the house and went up to the bathroom, they could ask her. But you have to start with normal crime investigation, and the Fourth Amendment protects- it doesn't protect you from committing crime, and it doesn't protect the government from collecting evidence about it. There was, in fact, no indication that Mr. Chaudhry went into the church, which makes it all the more surprising that it would include- We have a bubble created, quite a narrow bubble, about the time and place the bank robbery took place. A serious bank robbery. And whether he had compatriots or not, we didn't know. And so they finally, pursuant to a subpoena, they narrow it down to three possible people. At that point, a normal crime investigation would say, let's go talk to all three people and see which one's involved. They didn't have to do that, because they had other data that they could cross-match. But quite apart from it, this is just- I'm just talking about normal police techniques. And the argument you're making to suppress the subpoena is that because Google has this huge data bank, that they had to go into their entire data bank to get this particularized information, it's therefore a violent experiment that's too broad. I think, Your Honor, again, even putting aside the first step, there's no indication that there was probable cause for all 19 people who had their information searched. Those 19 people can complain. Mr. Chaudhry can't complain. He can't complain because they narrowed it down to where the crime was committed and the time it was committed. And he was a suspect. He became a suspect. Now, if the other 18 want to complain that they were included in that bubble, let them come forward. But that's true in every crime. I think Mr. Chaudhry is certainly complaining, and he is pointing to the broad nature of that search as evidence of its unconstitutionality. Coppenter looked at the investigative process. Whether there were 19, there could have been 1,000. There could have been 100. There was evidence. People gave me pictures. They were in their homes. They were all over the place. You narrow it down to simply to get the guy. We only care as to what happened with this person. That applies to anything else. That means just search everybody, and when you get the person, everybody else has no rights. Don't worry about it. We got your information on everything you've ever done on this thing because we got the guy, and he can't complain. But that's not the way Coppenter worked. Coppenter didn't do that. It didn't attach a standing requirement based upon just that individual there. I mean, this is coming out of air from somewhere that doesn't exist anywhere in reality. The reality of where we are with this situation right here is this court can proceed as it will, but the technology will go where it's going to go until it becomes evident that you will not have a Fourth Amendment right to basically anything in the direction we're headed. The Supreme Court saw it in Coppenter. Otherwise, everything that's been said here today, warrant, whatever, expectation of privacy existed as they said in Coppenter, would apply in Coppenter. Why in the world would the Supreme Court allow you to get this cell tower information here to locate this individual, and when you get it, he can't complain? Well, that's not how he did it. I think that's exactly right, and the privacy question is not one of a post hoc analysis where you see what got turned up in the search and then decide whether it's sensitive or not. You have to look at what the technology itself is capable of revealing prior to actually issuing that warrant, so the police didn't know whether there were going to be people in that church or not. They didn't just search what he left behind. They also retroactively searched the tailing of the movement of these people. You had the 30 before, the 30 after. It's not just what happened then. It's not a video where you've got nothing but what went on then. These are citizens. Indeed, and in step three, it wasn't Mr. Carpenter who was revealed. There was another woman who was picking up her child from school on her way back to their house, another who was visiting somebody in a hospital who then visited the church, and those are the two people, in addition to Mr. Chaudhary, that made it all the way through to step three, and you have to ask yourself, how did police get there? Because it was purely a matter of their discretion. There was no judge involved in that process. It was purely police discretion, and that is precisely the kind of— Didn't the warrant authorize that process? I thought it laid out the details of the process. The warrant laid out the three steps in this process. I think the warrant failed to inform the court of the nature of the search taking place. Was the magistrate involved in step three? The magistrate was not involved in step three. How was all law enforcement? It had nothing to do with magistrates. It was all law enforcement at step three. It was all law enforcement at step two. That's what search warrants are. When they're finished, they make a return to the judicial officer of the warrant, explaining what they did. The warrant return in this case was a single word, Your Honor. It said, data. They fix the return. Well, I think it's indicative of the lack of particularity in the warrant itself. The purpose of that return is so that the judge can check and see whether you followed the instructions in that warrant and whether what you took is consistent with what the warrant authorized. The reason that it says one word, data, in the return here is because the warrant itself was so amorphous and unclear about what was being searched and what could be seized. Thank you, Mr. Price. Thank you. Thank you very much for your argument. I appreciate the argument. If both counsel will come down and greet you and then continue with our cases for the day.
judges: Diaz, Wilkinson, Niemeyer, King, Gregory, Agee, Wynn, Thacker, Harris, Richardson, Quattlebaum, Rushing, Heytens, Benjamin, Berner